O 91 (Rev. 11/82)

**CRIMINAL COMPLAINT**

LODGED

ORIGINAL

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>SHI SHAN PIAO, a.k.a. "Mr. Park," and<br>JIA RUNZE, a.k.a. "Roger" | DOCKET NO.<br>2017 JUN 15 PM 2:30<br>CLERK U.S. DISTRICT COURT<br>CENTRAL DIST. OF CALIF.<br>RIVERSIDE<br>BY_____ | ED17-0287M<br>MAGISTRATE'S CASE NO. | FILED<br>CLERK, U.S. DISTRICT COURT<br>JUN 15 2017<br>CENTRAL DISTRICT OF CA... |

Complaint for violation of Title 18, United States Code, Sections 1349 and 1028A

| NAME OF MAGISTRATE JUDGE<br>Honorable Sheri Pym | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Riverside, California |
|---|---|---|

| DATE OF OFFENSE<br>2006 through the present | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

Beginning in or before December 2006, and continuing through the present, in Los Angeles County, within the Central District of California, and elsewhere, defendants SHI SHAN PIAO and JIA RUNZE, and others, conspired to commit bank fraud, in violation of Title 18, United States Code, Section 1344. The object of the conspiracy was carried out, and to be carried out, in substance, as follows:  Defendants PIAO and RUNZE would obtain the identifying information of real persons and apply for and build up credit in their names.  Defendants PIAO and RUNZE would then make purchases and obtain cash advances impersonating those identities and then abandoning them.  Federally-insured financial institutions defrauded as a result of this conspiracy include Chase Bank, NAVY Federal Credit Union, First Premier Bank, Citibank, Capital One, and U.S. Bank.

Beginning in or before December 2006, and continuing through the present, in Los Angeles County, within the Central District of California, and elsewhere, defendants SHI SHAN PIAO and JIA RUNZE knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person during and in relation to a felony violation of Title 18, United States Code, Section 1349, Conspiracy to Commit Bank Fraud, as charged in Count One of this complaint.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>Samuel H. Newlin-Haus |
|---|---|
| | OFFICIAL TITLE<br>Special Agent, Federal Bureau of Investigation |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[1] | DATE<br>June 15, 2017 |
|---|---|

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSA Andrew Brown, 11th floor, x0102 **AB**          WARRANT          Detention Requested for Both Defendants

## A F F I D A V I T

I, Samuel Hans Joseph Newlin-Haus, being duly sworn and under oath, hereby depose and say as follows:

### INTRODUCTION

1.     I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI") assigned to the Riverside Resident Agency of the Los Angeles Division.   I have been employed with the FBI as an SA since 2016.   I have had formal training at the FBI Academy relating to the investigation of financial crimes.   I have assisted in and/or personally conducted investigations involving financial institution fraud and identity theft.   I have received information and further training from members of the Riverside FBI White Collar Crime Squad regarding financial institution fraud and identity theft.

### PURPOSE OF AFFIDAVIT: ARRESTS AND SEARCH WARRANTS

2.     This affidavit is made in support of a criminal complaint and arrest warrants against JIA RUNZE, a.k.a. "Roger" ("RUNZE"), and SHI SHAN PIAO, a.k.a. Mr. Park ("PIAO"), for conspiracy to commit bank fraud and aggravated identity theft, in violation of Title 18, United States Code, Sections 1349 and 1028A.

3.     This affidavit is also made in support of search warrants for JIA RUNZE and SHI SHAN PIAO, and their vehicles and residences. (The search warrant for SHI SHAN PIAO's residence alone will be sought with this same affidavit in the District of Nevada as it is located there).

4.     The information set forth in this affidavit is based upon my participation in the investigation, encompassing my personal knowledge, observations and experience, as well as information obtained through my review of evidence, investigative reports,

1  interviews, debriefings with witnesses, and information provided by
2  other participating law enforcement agents.  As this affidavit is
3  being submitted for the limited purpose of securing the requested
4  warrants, I have not included each and every fact known to me
5  concerning this investigation.  I have set forth only the facts that
6  I believe are necessary to establish probable cause for the requested
7  warrants.

8                    **PREMISES TO BE SEARCHED**

9       5.   The premises to be searched (collectively, the "SUBJECT
10 PREMISES") are described as follows:

11 **In the Central District of California:**

12          a.   523-2 NORTH MOORE AVENUE, MONTEREY PARK, CA ("RUNZE'S
13 RESIDENCE") is described as follows:  the east unit of a two-story,
14 tan stucco, duplex building with a reddish brown tile roof and
15 attached two-door garage.  The numbers "523-2" are located above the
16 east-facing front door on the east side of the building facing NORTH
17 MOORE AVENUE.  The premises to be searched includes both the
18 residence and the garage or garage space behind the garage door
19 farthest to the east.  The premises to be searched includes vehicles
20 owned or controlled by JIA RUNZE (including A white, 2017 Hyundai
21 Genesis with dealer paper plates, Registered to JIA RUNZE, 108 Elm
22 Street, Alhambra, CA ("RUNZE'S WHITE GENESIS") and a blue 2016
23 Hyundai Genesis, California license number 7RWM209, registered to JIA
24 RUNZE, 108 Elm Street, Alhambra, CA ("RUNZE'S BLUE GENESIS") that are
25 found on or adjacent to RUNZE'S RESIDENCE.

26          b.   A BLACK HYUNDAI, SONATA, California license number
27 7UXN080, registered to Eun S. Lee, 3333 W. 2nd Street, Apartment 51
28 216, Los Angeles, CA 90004 ("PIAO'S HYUNDAI").

                                  2

1        c.    The person of SHI SHAN PIAO, a.k.a. Mr. Park ("PIAO"),
2  an Asian male, born on October 4, 1970, Black hair, Brown eyes,
3  height 5'7", weight approximately 160 pounds, matching the photograph
4  of California Department of Motor Vehicles identification card number
5  B9010963.

6        d.    The person of JIA RUNZE, a.k.a. Roger ("RUNZE"), an
7  Asian male, born on December 26, 1988, Black hair, Brown eyes, height
8  5'8", weight approximately 180 pounds, matching the photograph of
9  California Department of Motor Vehicles identification card number
10  D9830318.

11  **In the District of Nevada:**

12        e.    4987 INDIAN RIVER DRIVE, BUILDING 312, APARTMENT 132,
13  LAS VEGAS, NEVADA ("PIAO'S RESIDENCE").  PIAO'S RESIDENCE is further
14  described as a condominium within a two-story, red stucco building
15  with a red tile roof bearing a plaque with "Building 312" with
16  numbers "129-132" below.  BUILDING 312 is located on the south side
17  of INDIAN RIVER DRIVE between Sandy River Drive and Alexis Drive.
18  PIAO'S RESIDENCE is located on the second floor on the east side of
19  BUILDING 312.  The brown numerals "132" are located on the wall to
20  the left of the door to PIAO'S RESIDENCE.

21                          **INVESTIGATION BACKGROUND**

22        6.    RUNZE and PIAO are participants in an ongoing criminal
23  organization (PIAO Organization), which specializes in conducting
24  credit/loan fraud schemes and creating fraudulent identities for
25  individuals.

26        7.    PIAO creates fraud "franchises" in which he coaches
27  participants how to conduct credit fraud activities using the
28  identities he sells to the participants (franchisees).

8.    RUNZE is one of PIAO's franchisees.

9.    PIAO supplies the following types of identities for his fraud schemes:

a.    Identities with "586" prefix social security numbers. "586" social security numbers are issued in Guam to temporary workers.  When the workers return to their native country, the social security number and corresponding identity can be used for credit and money laundering schemes;

b.    Foreign nationals with U.S. visas and work permits who have, or are planning to return to their native country.  These identities also have valid social security numbers corresponding to individuals who are no longer in the United States.

c.    "Customers" who volunteer their identities to be used in credit building and bust-out schemes.

10.   PIAO's identities are used for at least three general illegal purposes: (1) fraudulent identities for individuals, (2) credit/loan bust-out schemes and (3) the lease and theft of vehicles.

**Fraudulent Identities for Individuals**

11.   The identities PIAO provides have valid social security numbers and no one to report the misuse of the identity allowing PIAO to prepare a package of fraudulent and fraudulently issued genuine identity documents for the customer.  The identity package consists of the following documents:

a.    A genuine 586 or other misappropriated social security card;

b.    A fraudulent foreign passport bearing the social security card identity but with the photograph and description of the customer;

1          c.    Fraudulent foreign birth certificates, marriage and

2     divorce documents with English translations;

3          d.    A fraudulently issued genuine driver's license issued

4     to the social security card identity with the customer's photograph

5     and description.

### Credit/Loan Bust-Out Scheme

7          12.   These identities' credit scores are built and converted to

8     cash in the following manner:

9          a.    A drop address is obtained;

10         b.    The credit report for the identity is updated to the

11    drop address, usually by opening a bank account;

12         c.    Credit cards are applied for at the bank where the

13    account is held;

14         d.    The credit cards are used and paid developing a credit

15    history and qualifying the identity for larger credit limit cards;

16         e.    Once the desired credit limit is attained on the

17    cards, the credit limits are drained by making charges to fake

18    merchant accounts, purchasing merchandise or gift cards and/or

19    obtaining cash advances.  The card is then discarded, or

20         f.    The balances are paid using other victims' stolen bank

21    account information, known in the fraud industry as a "double";

22         g.    The cards can then be re-charged to the credit limit

23    before the account takeover is discovered by the victim bank.

### Vehicle Lease/Theft Scheme

25         13.   After the subjects develop the drop address and credit

26    history for the identities, the identities are used to lease new

27    vehicles from co-conspirators working at vehicle dealerships;

a.   The subjects use the vehicles and pay the leases for several months in order to avoid compromising the dealership co-conspirator;

b.   The subjects sell the vehicle to unknown entities for parts and/or export from the United States;

c.   The lease payments cease.

14.   The investigation involves a confidential human source (CHS) who posed as a prospective franchisee of the PIAO Organization in order to gather evidence concerning the scope of the PIAO Organization.   CHS has provided physical evidence and made numerous consensual recordings of the co-conspirators while discussing their fraud operations in English and Korean.

15.   CHS's descriptions of meetings have been consistent with translations of the recorded meetings.   CHS has also provided physical evidence in the form of credit cards and credit card applications corroborating CHS's reporting.

16.   CHS has been paid for services and expenses and has received sentencing consideration on an unrelated matter.

**SUMMARY OF EVIDENCE AGAINST RUNZE**

17.   On or about October 22, 2015, CHS provided FBI agents with a copy of a social security card issued to C.Y.J. (Note: Only the initials of this individual, who is believed to be a victim of identity theft, are provided.)   CHS indicated that the social security card copy was provided by JIA RUNZE, a.k.a. "ROGER" (RUNZE), and that RUNZE planned to use the C.Y.J. identity to obtain fraudulently issued credit cards using an address provided by CHS (CHS Drop Address).

18.   On or about November 19, 2015, FBI agents observed CHS meet with RUNZE to provide mail addressed to C.Y.J. that RUNZE caused to be mailed to the CHS Drop Address.   FBI agents audio/video recorded the meeting.   I reviewed a transcript of the recording which indicated the following:

a.   RUNZE acknowledged opening a U.S. Bank account using the C.Y.J. identity.

b.   RUNZE instructed CHS to use the U.S. Bank debit card associated with the account for expenses and RUNZE would replenish the account as needed to build the credit score for the C.Y.J. identity to obtain a credit card.

19.   I reviewed U.S. Bank correspondence mailed to C.Y.J. at the CHS drop address which indicated U.S. Bank had opened a bank account in the name of C.Y.J.

20.   On or about March 1, 2016, FBI agents observed CHS meet with RUNZE to provide mail received at the CHS Drop Address, addressed to C.Y.J. from:   NAVY League, First Premier Bank, Citibank, Capital One, Credit One and Surge MasterCard.   FBI agents audio/video recorded the meeting.   I reviewed a transcript of the recording which indicated the following:

a.   RUNZE explained that membership with NAVY League allowed him to open lines of credit with the NAVY Federal Credit Union (NAVY FCU).

b.   RUNZE indicated the documents provided by CHS allowed him to eventually apply for and obtain two Chase credit cards valued at $12,000 each and one Citibank credit card valued at $10,000.

21. On or about March 17, 2016, FBI agents observed CHS meet with RUNZE. FBI agents audio/video recorded the meeting. I reviewed a transcript of the recording which indicated the following:

a. RUNZE provided CHS $2,000 in cash and informed CHS the credit cards he obtained using the C.Y.J identity would provide approximately $59,000.

b. RUNZE explained doing a "double" on a credit card account as follows: (1) Make purchase charges on the account up to its credit limit, (2) Pay the balance using another individual's bank account information, (3) Re-charge the account to its limit a second time.

c. RUNZE indicated that his partner's name is SHI SHAN PIAO (PIAO).

22. I reviewed copies of mail addressed to C.Y.J. provided by CHS discussed during the March 17, 2016, meeting that RUNZE caused to be mailed to the CHS drop address. The documents included credit cards issued to C.Y.J. from Citibank and Capital One, and a debit card issued to C.Y.J. from NAVY FCU.

23. FBI agents conducted physical surveillance during the March 17, 2016, CHS meeting with RUNZE. Agents conducting the surveillance observed RUNZE driving a 2016 Hyundai Veloster, CA license #7RCD265.

24. I reviewed California Department of Motor Vehicle (CADMV) registration records which indicated that the vehicle was registered to Q.H., 8829 Duarte Rd., San Gabriel, CA (San Gabriel Address).

25. I reviewed loss statements from Citibank and Capital One concerning Q.H. and the San Gabriel Address which revealed the Q.H. identity was a "586" identity and there were two additional identities using the San Gabriel Address for credit card accounts.

26. Based on my training and experience, I believe that the PIAO Organization used the identities associated with the San Gabriel Address to obtain fraudulently issued credit cards.

27. On or about April 6, 2016, CHS identified a California Department of Motor Vehicles (DMV) photograph of RUNZE with no identifying information as the individual CHS knows as "Roger." I reviewed California DMV information which indicated RUNZE's home address was 108 Elm Street, Alhambra, CA (his parents' address).

28. On or about April 28, 2016, CHS met with RUNZE to provide mail received at the CHS Drop Address addressed to C.Y.J., including a NAVY FCU credit card and a Chase credit card. FBI agents audio/video recorded the meeting. I reviewed a transcript of the recording which revealed the following:

    a. RUNZE told CHS he used the stolen identities to lease new vehicles for his personal use and then sells them for parts. RUNZE explained the tracking device used by dealerships on leased vehicles is removed so they cannot be tracked.

    b. RUNZE said he and his partner (PIAO) moved their office from Monterey Park to a house near New Avenue.

29. FBI agents conducted physical surveillance following the April 28, 2016, CHS meeting with RUNZE and observed RUNZE drive to 1408 New Avenue, Unit C, Rosemead, CA (Rosemead Address).

30. I reviewed loss statements from Chase, Citibank, Capital One, and NAVY FCU which revealed the Rosemead Address was used for credit card applications and accounts for six different "586" identities.

31. One of the identities associated with the Rosemead Address was Q.H. (previously listed as the name associated with the vehicle registration of a Hyundai driven by RUNZE).

32. Records from Citibank indicated several cash advances using a credit card issued to the Q.H. identity, including: $260 on July 6, 2016; $500 on July 8, 2016; $260 on July 9, 2016; $500 on July 12, 2016; and $180 on July 13, 2016 (referred to collectively as "the cash advances").

33. I reviewed Automated Teller Machine (ATM) video surveillance from Citibank. The Asian male obtaining the cash advances in the video matched JIA RUNZE.

34. Based on RUNZE's statements and my training and experience, I believe that the PIAO Organization used the identities associated with the Rosemead Address to obtain fraudulently issued credit cards and RUNZE impersonated Q.H. in order to obtain cash advances.

35. On or about June 6, 2016, FBI agents observed CHS meet with RUNZE to provide mail addressed to C.Y.J. received at the CHS Drop Address. FBI agents audio/video recorded the meeting. RUNZE provided CHS with $5,000 cash and a $7,000 Citibank cashier's check issued with the listed remitter as "RJ America, Inc." RUNZE took the NAVY FCU debit card from CHS.

36. A business records check concerning "RJ America, Inc." showed RUNZE as the listed CEO and the business address was RUNZE's residence located at 108 Elm Street, Alhambra, CA.

37. A review of victim bank electronic records and interview reports revealed credit card account losses associated with the C.Y.J. identity from Capital One, Chase Bank and Citibank.

38.   It appears that RUNZE has been involved in identity theft since November 2012 or before.  He bragged to the CHS in 2015 about his continuing involvement in leasing cars in false identities and then selling the cars for parts, but did not say for how long he had been doing that.  His criminal record, however, shows he was arrested in November 2012 for a number of offenses, resulting in a later felony conviction for false impersonation.

### RUNZE WORKS AT A BROTHEL WHICH MAY SUPPORT IDENTITY THEFT

39.   On April 1, 2017 CHS contacted RUNZE on RUNZE's cellular telephone.  I reviewed the audio recording in which CHS asked RUNZE about the fraudulent passport he previously promised to obtain. RUNZE told CHS he tried three times to ship the passport but was unable to get the passport from China because he did not have any friends there anymore.  RUNZE claimed he no longer worked in the fraud business.  RUNZE told CHS he had new work and said he helps "working girls" (prostitutes) by opening up "the house" (brothel), cooking for them, and picking up "the stuff".  RUNZE asked CHS if he/she knew the house RUNZE referred to and CHS responded yes.  RUNZE told CHS he earns $4,000 per month.  As described in more detail below, women who come to the U.S. to work as prostitutes often give up their social security numbers for use in identity theft when they return to their native countries.

40.   On May 10, 2017, FBI agents conducted surveillance of RUNZE's RESIDENCE and observed two young Asian females knocking on the door of RUNZE's RESIDENCE.

41.   GPS tracking of RUNZE's cellular telephone provided pursuant to a federal search warrant during May and June revealed

1  RUNZE has taken two trips to the Washington D.C. area for a few days

2  each trip.

3       42.  SA Bud Spencer, who has over 18 years with the FBI, and has

4  investigated Asian criminal enterprises indicated that RUNZE's

5  statements and actions are consistent with identity fraud and

6  involvement in human trafficking/prostitution operations for the

7  following reasons:

8            a.   Asian human trafficking in support of prostitution

9  operations are often accomplished by obtaining fraudulently obtained

10  business, tourist or student visas in the United States for the

11  prostitutes which may involve the issuance of a social security

12  number.

13           b.   Since the prostitutes are foreign nationals with valid

14  social security numbers, their identities are attractive to identity

15  theft/credit fraud operations since the prostitute will likely only

16  be in the United States for a limited time and their identities can

17  be used over time to build and bust-out credit.

18           c.   Once in the United States, the prostitutes are often

19  rotated to different brothels around the United States necessitating

20  co-conspirators escorting them on interstate travel due to the

21  prostitutes' inability to speak English and unfamiliarity with the

22  United States.

23              **JIA RUNZE Lives at RUNZE'S RESIDENCE**

24       43.  On May 16, 2017, I conducted physical surveillance of

25  RUNZE'S RESIDENCE (523-2 NORTH MOORE AVENUE, MONTEREY PARK, CA) and

26  observed the following:

27           a.   An Asian male matching RUNZE's description exited

28  RUNZE'S RESIDENCE;

                                    12

b.     The Asian male was driving RUNZE'S BLUE GENESIS;

c.     RUNZE'S WHITE GENESIS was parked in the driveway area of RUNZE'S RESIDENCE.

### SUMMARY OF EVIDENCE AGAINST PIAO

44.   On June 14, 2016, FBI agents observed CHS meet someone later identified by photograph as PIAO.  FBI agents audio/video recorded the meeting.  I reviewed an FBI draft summary translation (Korean to English) of that meeting, which indicated the following:

a.     PIAO told CHS he started ROGER (RUNZE) in the credit fraud business and sold ROGER (RUNZE) the "586" identities used in the fraud scheme.

b.     PIAO explained that he buys the identities from China that belonged to people who were temporary workers in Guam and returned to China.  PIAO builds the credit for the identity which eventually generates $80,000 to $120,000 in credit proceeds for each identity.

c.     PIAO indicated that he has opened fictitious merchant accounts in order to convert the credit limits to cash.

d.     PIAO told CHS it is important to buy a second hand laptop computer, use it for only one case, and then dump it afterwards.

e.     PIAO indicated he has drop addresses in many cities and has been conducting credit card fraud for ten (10) years with no problems from the police.

45.   On July 7, 2016, FBI agents observed CHS meet PIAO.  FBI agents audio/video recorded the meeting.  I reviewed an FBI draft summary translation (Korean to English) of that meeting, which indicated the following:

13

a.   PIAO ordered social security numbers from a contact in China who sent an image of the social security number through "Kakao Talk", a Korean instant messaging service.

b.   The China contact mailed the physical social security cards after receiving payment of $5,000 per card.

c.   PIAO received packages containing the cards within 1-2 weeks from the purchase date.  The cards are hidden in clothing to avoid customs.

d.   PIAO removes the "valid for work only" restriction from the cards.

e.   PIAO indicated that the benefit of using authentic identities is that the identity can be used to obtain genuine identification documents.

f.   PIAO stated that he had a genuine Chicago driver's license and was able to bust out $80,000 in one day using credit cards issued to the identity.

46.  On July 25, 2016, FBI agents observed CHS purchase a social security card issued to Y.Z. from PIAO.  FBI agents audio/video recorded the meeting.  I reviewed an FBI draft summary translation (Korean to English) of that meeting, which indicated the following:

a.   PIAO showed CHS two social security cards issued to Y.F. and Y.Z.  CHS paid PIAO $5,000 for the Y.Z. identity social security card, $1,000 for a fraudulent passport to match the identity, and provided two passport photographs to PIAO for the fraudulent passport.

b.   PIAO planned to purchase four additional social security cards for the credit/loan bust-out scheme.  PIAO suggested

the CHS open a business and create a merchant account in order to convert the credit limits to cash.

c.   PIAO told CHS he has lived off the credit/loan bust-out scheme and wanted to continue it with the CHS for a long time.

47.   On July 28, 2016, FBI agents observed CHS meet with PIAO. FBI agents audio/video recorded the meeting.  I reviewed an FBI draft summary translation (Korean to English) of that meeting, which indicated the following:

a.   PIAO told CHS if they circulate their scheme for 4-6 months, they will have 3-4 credit cards with a combined credit of $200,000 to $300,000 per identity.

b.   PIAO told CHS he planned to use the Y.Z. identity to create merchant accounts.

c.   PIAO told CHS the scheme can produce $1 million annually.

48.   On or about September 21, 2016, PIAO provided CHS his personal Chinese passport as collateral.  PIAO's passport identified him as follows: SHISHAN PIAO, Date of Birth (DOB): October 4, 1970, Chinese passport number Gi9613593.

49.   I examined the DMV photograph associated with SHI SHAN PIAO, Date of Birth: October 4, 1970 and the photograph matched the appearance of the individual meeting with the CHS.

50.   On or about October 26, 2016, PIAO instructed CHS telephonically to drop off an electronic copy of the Y.Z. social security card to a house in Los Angeles so PIAO could digitally remove the work only restriction.  CHS traveled to the location and reported the following:

a.   The front room of the house was being used as an office.

b.   PIAO was working with two male individuals.  One of the males identified himself as Young Hoon (phonetic)

c.   CHS observed laptop computers inside the location with Navy Federal Credit Union credit card applications on the screens.

51.   On or about November 18, 2016, PIAO contacted CHS telephonically and indicated that CHS's passport was ready.  CHS met with PIAO who provided CHS a fraudulent Chinese passport issued to Y.Z. bearing CHS's photograph.  PIAO indicated he was using 4444 West Desert Inn Road, Las Vegas, Nevada, as another drop address for credit fraud activities.

52.   On or about January 6, 2017, FBI agents observed CHS meet PIAO to discuss obtaining fraudulently issued genuine driver's licenses.  FBI agents audio/video recorded the meeting.  I reviewed an FBI draft summary translation (Korean to English) of that meeting, which indicated the following:

a.   PIAO has a DMV employee contact and is already in the process of obtaining a fraudulently issued Nevada driver's license using the Y.F. identity.  PIAO obtained a temporary Nevada driver's license using the Y.F. identity on December 16, 2016.

b.   PIAO needed to return to Las Vegas, Nevada, to complete the application process for his Nevada driver's license and offered to arrange for CHS to obtain a fraudulently issued driver's license using the Y.Z. identity.  PIAO told CHS the DMV employee charged $5,600 to obtain the license.

53.   On or about January 17, 2017, I and other FBI Agents observed CHS meet with PIAO and conduct a controlled purchase of a

fraudulently issued genuine Nevada driver's license at the Nevada Department of Motor Vehicles in Henderson, NV, (Nevada DMV). FBI agents audio/video recorded the meeting. I reviewed an FBI draft summary translation (Korean to English) of that meeting, which indicated the following:

a. PIAO provided fraudulent documents issued in the name of Y.Z. to support the driver's license application, including: a fraudulent Chinese birth certificate with English translation, and a fraudulent document in Chinese bearing CHS's photograph which PIAO told CHS was a divorce certificate.

b. CHS gave $5,600 to an Asian female who indicated she was a Nevada DMV employee.

c. CHS received a temporary Nevada driver's license issued to the Y.Z. identity.

54. On or about February 2, 2017 FBI agents observed CHS meet with PIAO to discuss the status of the Nevada driver's license. FBI agents audio/video recorded the meeting. CHS reported the following:

a. PIAO indicated that the Nevada DMV issued him a permanent driver's license in the name of Y.F.

b. PIAO gave CHS a Nevada DMV driver authorization card issued to Y.Z bearing CHS's photograph.

c. PIAO showed CHS a credit report for the Y.Z. identity and a fake utility bill addressed to Y.Z. in Las Vegas, Nevada.

55. On or about March 13, 2017, CHS met with PIAO and provided CHS a fraudulently issued genuine Nevada driver's license issued to Y.Z. bearing CHS's photograph.

56. I reviewed Nevada DMV records, which confirmed driver's licenses were issued to Y.F. (the identity used by PIAO, and which

17

bore PIAO's photograph) and Y.Z. (the identity used by CHS, and which bore CHS's photograph).

### PIAO Uses PIAO'S HYUNDAI and Lives at PIAO'S RESIDENCE

57.   On or about March 13, 2017, CHS met with PIAO.  FBI agents audio/video recorded the meeting.  I reviewed an FBI draft summary translation (Korean to English) of that meeting, which indicated PIAO informed CHS that he planned to move to Las Vegas, NV, to continue conducting his credit fraud business.

58.   SA Jacob Hale, Special Agent, Las Vegas Division, Federal Bureau of Investigation, used the court ordered GPS tracking information provided by PIAO's cellular telephone provider to track PIAO's cellular telephone.  On May 18, 2017, SA Hale indicated that PIAO's cellular telephone was located within the Bella Vita housing complex in Las Vegas, Nevada 89103.  Through the use of a cell-site simulator, SA Hale narrowed its location to BUILDING 312, UNIT 132 (PIAO'S RESIDENCE).

59.   SA Tyler Stevens, Special Agent, Las Vegas Division, Federal Bureau of Investigation, conducted surveillance of PIAO's RESIDENCE and told me the following:

a.   On June 2, 2017, Stevens observed an Asian male, approximately 5'7", 140 pounds, wearing a white, short-sleeved collared shirt enter a BLACK HYUNDAI SEDAN with California license plate 7UXN080 (PIAO'S HYUNDAI) and leave the area.

b.   On June 5, 2017, Stevens observed an Asian male matching PIAO's description exiting 4987 INDIAN RIVER DRIVE, BUILDING 312, UNIT 132, LAS VEGAS, NEVADA (PIAO'S RESIDENCE).

## PIAO CONTINUES TO SELL STOLEN IDENTITIES

60.   On or about March 13, 2017, CHS met with PIAO.   FBI agents audio/video recorded the meeting.   I reviewed an FBI draft summary translation (Korean to English) of that meeting, which indicated the following:

a.   PIAO was working with Young Hoon (phonetic) in Las Vegas, the individual whom CHS met in Los Angeles while working with PIAO;

b.   CHS would need to travel to Las Vegas, NV in order to open bank accounts for the identities to start building credit for the identities.

c.   Park had four or five identities ready for purchase.

61.   On or about June 9, 2017, CHS contacted SA Bud Spencer.   SA Spencer told me the following:

a.   CHS contacted PIAO and told him that CHS has obtained money to purchase more identities.

b.   PIAO agreed to come to Los Angeles to meet with CHS on June 20, 2017.

62.   GPS records showed that PIAO's cellular telephone crossed from Nevada to California around 4:30pm on June 13, 2017.   FBI agents told me they conducted surveillance on PIAO'S RESIDENCE around then and did not see PIAO'S HYUNDAI anywhere near it (previously, they had seen PIAO'S HYUNDAI repeatedly in the same space adjacent to PIAO'S RESIDENCE).   GPS records show that on June 14, 2017, PIAO's cellular telephone was traveling around Los Angeles.   Thus it appears that PIAO has driven back to the Central District in PIAO'S HYUNDAI.

**Training and Experience Regarding Fraud:**

63.   SA Bud Spencer, who has over 18 years in the FBI and has investigated fraud, told me the following from his training and experience:   Individuals involved in identity theft schemes like this one must keep evidence of their schemes, such contact information for their co-conspirators, lists of victim information and accounts used in the scheme, simply to keep the scheme going.   Most of this evidence is now stored on digital devices such as computers and smartphones.   Identity thieves who use fraudulent credit cards often use them to purchase items with a high resale value, such as electronics or designer clothing or bags, which they keep in new condition to sell on for cash, or to return for a refund, which may take the form of cash or gift cards.   Typically, they maintain all this evidence where is close at hand and safe, such as in their residences, automobiles, and, especially with smartphones, on their person.   For larger or more sophisticated frauds, participants often attempt to distance themselves from some of the incriminating evidence by renting public storage units or safety deposit boxes where they often keep the items they will not need immediate access to.

## Information for Detention Purposes

### PIAO Is In the U.S. Illegally

64.   On April 3, 2017 I contacted Immigration and Customs Enforcement Special Agent Brittney Rutledge and provided PIAO's and RUNZE's information.   SA Rutledge informed me PIAO filed for a visa extension on October 31, 1997 that was valid for six (6) months.   SA Rutledge stated PIAO is out of status as an overstay and subject to administrative arrest.   SA Rutledge further informed me that ICE would place a detainer on PIAO after he was arrested.

**RUNZE Faces Deportation After Conviction**

65.   SA Rutledge further informed me that RUNZE is a green card holder since 2005 and has no pending applications at this time.   She said that RUNZE would be placed in removal proceedings if he were convicted of an aggravated felony under immigration law (8 USC Section 1227(a)(2)(A)(iii)).   Fraud offenses for which the loss exceeds $10,000. constitute "aggravated felonies." 8 USC § 1101(a)(43)(M)(i).

**PIAO's Organization Wires Money Overseas**

66.   According to bank records, 816 South Stoneman Avenue, Apartment H, Alhambra, CA 91801, one of the drop addresses associated with the PIAO Organization, was used on wire transfer requests to China.   For example, between October of 2016 and December of 2016, J.C. originated 11 money remittances totaling $21,000 to Q.W. in Nanchang City, China.

**RUNZE Can Obtain Genuine Driver's Licenses Fraudulently**

67.   On or about July 7, 2016, RUNZE told CHS he planned to go to Seattle, Washington to obtain a fraudulently issued genuine driver's license through a contact associated with the Department of Motor Vehicles (DMV).

**SCOPE OF THE PIAO ORGANIZATION**

68.   To date, the investigation has identified (20) suspected drop addresses, (4) fraudulent merchant accounts and (58) suspected stolen identities being used by the PIAO Organization in (6) states.

69.   Victim creditors have identified approximately $900,000 in losses associated with the fraudulent merchant accounts and stolen identities identified to date.   This is just the loss documented so far, however, and appears to vastly understate the true losses.

70. Review of FBI investigative reports from a previous investigation revealed that PIAO, using the name San-e, was soliciting customers to purchase fraudulent identity documents in 2012.

71. Based on PIAO's statements of being in the business for 10 years and generating an annual income from the credit/loan bust out scheme of $1 million, additional estimated loss is $10,000,000.

## TRAINING AND EXPERIENCE ON DIGITAL DEVICES

72. As used below, the term "digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes used to store digital data (excluding analog tapes such as VHS), and memory chips; and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of the premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.

22

1   There are so many types of digital devices and software in use today

2   that it is impossible to bring to the search site all of the

3   necessary technical manuals and specialized equipment necessary to

4   conduct a thorough search.  In addition, it may also be necessary to

5   consult with specially trained personnel who have specific expertise

6   in the type of digital device, software application or operating

7   system that is being searched.

8          b.   Digital data is particularly vulnerable to inadvertent

9   or intentional modification or destruction.  Searching digital

10  devices can require the use of precise, scientific procedures that

11  are designed to maintain the integrity of digital data and to recover

12  "hidden", erased, compressed, encrypted or password-protected data.

13  As a result, a controlled environment, such as a law enforcement

14  laboratory or similar facility, is essential to conducting a complete

15  and accurate analysis of data stored on digital devices.

16         c.   The volume of data stored on many digital devices will

17  typically be so large that it will be highly impractical to search

18  for data during the execution of the physical search of the premises.

19  A single megabyte of storage space is the equivalent of 500 double-

20  spaced pages of text.  A single gigabyte of storage space, or 1,000

21  megabytes, is the equivalent of 500,000 double-spaced pages of text.

22  Storage devices capable of storing 500 gigabytes (GB) of data are now

23  commonplace in desktop computers.  Consequently, each non-networked,

24  desktop computer found during a search can easily contain the

25  equivalent of 240 million pages of data, that, if printed out, would

26  completely fill three 35' x 35' x 10' rooms to the ceiling.  Further,

27  a 500 GB drive could contain as many as approximately 450 full run

28  movies or 450,000 songs.

d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet.   Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.   Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten.   In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.   Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache.   The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.   Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.   Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.

e.    Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), digital devices can

contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment.

     f.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to

rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment.

g.    The United States has not attempted to obtain this data by other means.

## CONCLUSION

73. Based upon the foregoing facts and my training and experience, I believe there is probable cause to believe that JIA RUNZE and SHI SHAN PIAO conspired to commit bank fraud and committed aggravated identity theft in violation of Title 18, United States Code, Sections 1349 and 1028A, and that evidence of the violations listed in Attachment B will be found at the SUBJECT PREMISES.

Samuel Hans Joseph Newlin-Haus,
Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
this 15th day of June, 2017.

_____
UNITED STATES MAGISTRATE JUDGE